Slip Op. 20-173

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MANCHESTER TANK & EQUIPMENT CO. AND WORTHINGTON INDUSTRIES, | |
| Plaintiffs, | |
| v. | Before: Mark A. Barnett, Judge |
| UNITED STATES, | Court No. 19-00147 |
| Defendant, | |
| and | |
| SAHAMITR PRESSURE CONTAINER PLC., | |
| Defendant-Intervenor. | |

[Sustaining the U.S. Department of Commerce's final determination in the antidumping duty investigation of steel propane cylinders from Thailand.]

Dated: December 3. 2020

<u>Paul C. Rosenthal</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for Plaintiffs. With him on the brief were <u>David C. Smith, Jr., Matthew G. Pereira, an</u>d R<u>. Alan Luberda</u>.

<u>Alison S. Vicks</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Tara K. Hogan</u>, Assistant Director.  Of counsel on the brief was <u>Vania Wang</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Ron Kendler</u>, White & Case LLP, of Washington, DC, argued for Defendant-Intervenor. With him on the brief was <u>David E. Bond</u>.

Barnett, Judge:  This matter is before the court following the final determination

of the U.S. Department of Commerce ("Commerce" or "the agency") in the antidumping

duty investigation of steel propane cylinders ("cylinders") from Thailand for the period of

investigation April 1, 2017, through March 31, 2018 ("the POI").[1]  *See Steel Propane*

*Cylinders From Thailand*, 84 Fed. Reg. 29,168 (Dep't Commerce June 21, 2019) (final

determination of sales at less than fair value) ("*Final Determination*"), ECF No. 22-4,

and accompanying Issues and Decision Mem., A-549-839 (June 17, 2019) ("I&D

Mem."), ECF No. 22-5.

On June 18, 2018, Commerce initiated this investigation.  *See Steel Propane*

*Cylinders From the People's Republic of China, Taiwan, and Thailand*, 83 Fed. Reg.

28,196 (Dep't Commerce June 18, 2018) (initiation of less-than-fair-value

investigations), PR 40, CJA (Vol. I) Tab 4.  During the investigation, Plaintiffs

Manchester Tank & Equipment Co. and Worthington Industries (collectively, "Plaintiffs,"

or when in reference to the administrative proceeding, "Petitioners") and Defendant-

Intervenor Sahamitr Pressure Container Plc. ("Sahamitr" or "SMPC")[2] each

---

[1] The administrative record for this case is divided into a Public Administrative Record
("PR"), ECF No. 22-2, and a Confidential Administrative Record ("CR"), ECF No. 22-3.
The Parties submitted joint appendices containing record documents cited in their
briefs.  *See* Nonconfidential Joint Appendix, ECF Nos. 47 (Vol. I), 47-1 (Vol. II), 47-2
(Vol. III), 47-3 (Vol. IV), 47-4 (Vol. V); Confidential Joint Appendix ("CJA"), ECF Nos. 46
(Vol. I), 46-1 (Vol. II), 46-2 (Vol. III), 46-3 (Vol. IV), 46-4 (Vol. V).  Citations are to the
confidential joint appendix unless stated otherwise.
[2] Commerce selected Sahamitr as the sole mandatory respondent.  *See* Respondent
Selection Mem. (July 9, 2018), PR 52, CJA (Vol. I) Tab 7.

recommended different model-match criteria.[3]  *See, e.g.*, Pet'rs' Cmts. on the Important

Prod. Characteristics and Prod. Matching Hierarchy (July 6, 2018), PR 48, CJA (Vol. I)

Tab 5; [SMPC] Cmts. on AD Questionnaire Prod.-Matching Characteristics (July 6,

2018), PR 49, CJA (Vol. I) Tab 6.  For the portion of the CONNUM related to the

external coating of the cylinder, Commerce initially instructed Sahamitr to report codes

that indicate whether a cylinder is coated or uncoated.  *See* Ltr. Physical Characteristics

for the Antidumping Duty Investigation of Steel Propane Cylinders from Thailand (July

25, 2017) ("Initial Model-Match Ltr."), Attach. 1B, ECF p. 155, PR 63, CJA (Vol. I) Tab

11.  In its questionnaire responses, Sahamitr provided a further breakdown of coated

cylinders, distinguishing between zinc-coated and other-coated cylinders in addition to

uncoated cylinders.  Narrative Resp. of [Sahamitr] to Secs. B, C, and D of the

Antidumping Duty Questionnaire (Sept. 13, 2018) ("BCDQR") at B-14, C-12, CR 49–51,

PR 84–86, CJA (Vol. I) Tab. 14.  For the *Preliminary Determination*, Commerce relied

on this additional distinction.  *See* Decision Mem. for the Prelim. Determination (Dec.

18, 2018) ("Prelim. Mem.") at 9, PR 162, CJA (Vol. III) Tab 31.

---

[3] In any antidumping proceeding, there may be numerous "models" or "types" of products that meet the description of the product under investigation.  In order to ensure an apples-to-apples comparison of sales in the U.S. and home markets, Commerce establishes a set of product criteria, from most to least important, to identify identical and similar products.  Within each of these criteria, the distinct characteristics are given different numeric values which, when listed next to each other, constitute the "control number" or "CONNUM" for that "model" or "type."  In other words, the CONNUM is a number designed to reflect the "hierarchy of certain characteristics used to sort subject merchandise into groups" and allow Commerce to match identical and similar products across markets.  *Bohler Bleche GmbH & Co. KG v. United States*, 42 CIT ___, ___, 324 F. Supp. 3d 1344, 1347 (2018).

Following Commerce's *Preliminary Determination*, Petitioners submitted comments challenging, in relevant part, the model-match methodology and the reliability of Sahamitr's cost of production information.  Pet'rs' Case Br. on [Sahamitr] (May 2, 2019) ("Pet'rs' Case Br.") at 6–20, 42–50, CR 280, PR 196, CJA (Vol. V) Tab 41; *see also* Rebuttal Br. of [Sahamitr] (May 9, 2019) at 10–11, CR 282, PR 199, CJA (Vol. V) Tab 42 (responding to Petitioners' argument regarding cost of production information).

For the *Final Determination*, Commerce continued to use the CONNUM data that distinguished zinc-coated cylinders from other-coated cylinders for model-match purposes.  *See* I&D Mem. at 22–24.  Commerce also found Sahamitr's reported costs to be reliable and rejected Petitioners' arguments that Sahamitr's failure to reliably report cost of production data warranted total adverse facts available (or "total AFA").  *Id.* at 36–40.  Commerce calculated a weighted-average dumping margin for Sahamitr of 10.77 percent.  *See Final Determination*, 84 Fed. Reg. at 29,169.

Before the court, Plaintiffs challenge Commerce's determinations to rely on the zinc coating distinction in the model-match methodology and Sahamitr's reported cost data.  *See* Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 27, and accompanying Confidential Pls.' Mem. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. ("Pls.' Mem."), ECF No. 29; Confidential Pls.' Reply Br. ("Pls.' Reply"), ECF No. 44.

Defendant United States ("the Government") and Sahamitr filed responses supporting the *Final Determination*.  *See* Confidential Def.'s Resp. to Pls.' Mot. for J. Upon the Agency R. ("Gov't's Resp."), ECF No. 38; Confidential Def.-Int.'s Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. ("SMPC's Resp."), ECF No. 41.

For the reasons discussed below, the court sustains Commerce's *Final Determination* and denies Plaintiffs' motion for judgment on the agency record.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[4] and 28 U.S.C. § 1581(c) (2018).  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

## I.   Zinc Coating

### A.  Legal Framework

To calculate a dumping margin, Commerce compares the amount by which normal value exceeds the export price or constructed export price.  *See* 19 U.S.C. § 1677(35)(A).  To calculate normal value, Commerce determines "the price at which the foreign like product is first sold . . . for consumption in the exporting country . . . in the ordinary course of trade."  19 U.S.C. § 1677b(a)(1)(B)(i); *see also Pastificio Lucio Garofalo, S.p.A. v. United States*, 35 CIT 630, 632–33 & n.6, 783 F. Supp. 2d 1230, 1233 & n.6 (2011), *aff'd*, 469 F. App'x 901 (Fed. Cir. 2012) (detailing the statutory scheme by which Commerce determines whether sales were made in the ordinary course of trade).  Foreign like product is statutorily defined according to a hierarchy of

---

[4] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition.

characteristics.  *See* 19 U.S.C. § 1677(16).[5]  "Congress has granted Commerce

considerable discretion to fashion the methodology used to determine what constitutes

'foreign like product' under the statute."  *SKF USA, Inc. v. United States*, 537 F.3d 1373,

1379 (Fed. Cir. 2008) (citation omitted).

       Determinations of both identical and like/similar (i.e., non-identical but capable of

comparison) merchandise are made using Commerce's model-match methodology.

*See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1383–84 (Fed.

Cir. 2001).[6]  The discretion that the statute affords Commerce to establish its model-

match methodology allows it to find certain products to be identical, notwithstanding

minor differences in physical characteristics, if those differences are commercially

insignificant.  *Id. at* 1384 (Fed. Cir. 2001); *see also* 19 C.F.R. § 351.411(a) (Commerce

"may determine that merchandise sold in the United States does not have the same

---

[5] Those characteristics are, in order of preference:
    (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
    (B) Merchandise-- (i) produced in the same country and by the same person as the subject merchandise, (ii) like that merchandise in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the subject merchandise.
    (C) Merchandise-- (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation, (ii) like that merchandise in the purposes for which used, and (iii) which [Commerce] determines may reasonably be compared with that merchandise.
19 U.S.C § 1677(16).

[6] Prior to 1995, the statute used the "term 'such or similar merchandise' . . . and was replaced (following the enactment of the [Uruguay Round Agreements Act, Pub. L. No. 103–465, 108 Stat. 4809 (1994)]) by the term 'foreign like product.'"  *Pesquera*, 266 F.3d at 1384 n.8.

physical characteristics as the merchandise sold in the [home] market," and that

Commerce "will make a reasonable allowance for such differences").

### B. Background

Shortly after initiating this investigation, Commerce issued a letter containing the

criteria to be used for the model-match methodology.  Initial Model-Match Ltr., Attach.

1B.  Although the letter instructed Sahamitr to report a cylinder as coated or uncoated,

*id.*, Attach. 1B, ECF p. 155, Sahamitr reported three codes for coating: uncoated,

coated-normal, and coated-special (i.e., zinc coating), *see* BCDQR at B-14, C-12.

In a supplemental questionnaire, Commerce directed Sahamitr to correct its

response consistent with the Initial Model-Match Letter.  *See* Narrative Resp. of

[Sahamitr] to the Suppl. Sec. B and Sec. C Questionnaire (Nov. 6, 2018) ("SBCQR") at

SSQ-10, SSQ-25, CR 106–120, PR 134–139, CJA (Vol. II) Tab 22.  Sahamitr reported

cylinder coatings as instructed but also included an alternative CONNUM field based on

the same three coating classifications that it reported in response to the initial

questionnaire.  *See id.* at SSQ-10 to SSQ-11, SSQ-25 to SSQ-26, Exs. SSQ-9 & SSQ-

26.

Sahamitr argued to Commerce that zinc-coated cylinders are not comparable to

non-zinc-coated cylinders such that Sahamitr's margin would be inaccurate or distorted

if Commerce relied on the model-match criteria in the Initial Model-Match Letter.  *See id*.

at SSQ-10 to SSQ-11.  Sahamitr explained that it applies zinc coating at its customer's

request and that zinc coating has a "significant and direct bearing on the per-unit prices

and per-unit production costs of SMPC's zinc-coated steel propane cylinders."  *Id.* at

SSQ-10; *see also* Narrative Resp. of [Sahamitr] to the First Suppl. Sec. D Questionnaire

(Nov. 13, 2018) ("SDQR") at FSD-11, CR 159–60, PR 141, CJA (Vol. II) Tab 24.

Sahamitr pointed out that "products with zinc coating are sold in [Sahamitr's] home

market and, in contrast, are never sold in the United States."  SDQR at FSD-11.

For its *Preliminary Determination*, Commerce used Sahamitr's dataset that

distinguished between zinc-coated cylinders and cylinders with other coatings,

notwithstanding Petitioners' objections.  Prelim. Mem. at 9; Analysis for the Prelim.

Determination (Dec. 18, 2018) at 6, CR 196, PR 165, CJA (Vol. III) Tab 32.

For the *Final Determination*, Commerce continued to account for zinc coating in

the model-match methodology.  *See* I&D mem. at 22–24.  Commerce explained that it

confirmed at verification that Sahamitr applies zinc coating at its customer's request and

that zinc coating requires additional steps in the production process.  *See id.* at 22

(citations omitted); *see also* Verification of the Sales Resps. of [Sahamitr] (Apr. 15,

2019) at 16, CR 277, PR 192, CJA (Vol. V) Tab 38 (referencing Sales Verification Exs.

For [Sahamitr] (Mar. 12, 2019), Ex. SVE-5A, CR 229–51, PR 183, CJA (Vol. V) Tab 36).

Per-unit comparisons showed that the cost of producing zinc-coated cylinders was

"significantly higher" than for non-zinc-coated cylinders.  I&D Mem. at 23 & n.184

(citation omitted).  Citing Sahamitr's 2016 annual report, Commerce also found that zinc

coating "prevent[s] metal from rusting in humid climates."  *Id.* at 22 & n.175 (citing Exs.

Accompanying the Narrative Response of [Sahamitr] to Sec. A of the Antidumping Duty

Questionnaire, (Aug. 13, 2018) ("AQR"), Ex. A-9 at 89, CR 38–47, PR 72–76, CJA (Vol.

I) Tab 13).

### C.  Parties' Arguments

Before the court, Plaintiffs advance the following arguments.  First, Plaintiffs argue that Commerce departed from its policy of using the model-match methodology announced at the outset of an investigation.  Pls.' Mem. at 14–17.  Second, Plaintiffs argue that Commerce did not support its revision to the model-match methodology with compelling reasons or substantial evidence.  *Id.* at 17–20.  Third, Plaintiffs argue that substantial evidence does not support Commerce's finding that zinc coating is commercially significant.  *Id.* at 20–28.

The Government counters that substantial evidence supports the agency's determination that zinc coating is a commercially significant characteristic, Gov't's Resp. at 9–10, and further assert that compelling reasons support Commerce's determination to revise the model-match methodology, Gov't's Resp. at 17–18; *see also* SMPC's Resp. at 4–6.  The Government points to evidence that Thai customers request zinc coating, zinc coating requires a special process, and zinc coating extends the useful life of a cylinder and prevents rusting in humid climates.  *See* Gov't's Resp. at 10–11.

### D.  Substantial Evidence Supports Commerce's Use of Zinc Coating in the Model-Match Methodology

#### 1.  Standard of Review Applicable to Commerce's Selection of Model-Match Criteria

The parties articulate, and Commerce applied, a more rigorous standard concerning its development of the model-match criteria than was necessary.  The U.S. Court of International Trade and the U.S. Court of Appeals for the Federal Circuit have looked for "compelling reasons" when Commerce modifies a model-match methodology

in a review after having used that methodology in previous segments of the proceeding. *See, e.g.*, *SFK USA*, 537 F.3d at 1380; *Koyo Seiko Co. v. United States*, 31 CIT 1512, 1517–18, 516 F. Supp. 2d 1323, 1331–32 (2007), *aff'd* 551 F.3d 1286 (Fed. Cir. 2008); *Fagersta Stainless AB v. United States*, 32 CIT 889, 894–95, 577 F. Supp. 2d 1270, 1276–77 (2008).  "Compelling reasons" require the agency to provide "compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question, that there have been changes in the relevant industry, or that there is some other compelling reason" requiring the change.  *Fagersta*, 32 CIT at 894, 577 F. Supp. 2d at 1277 (citation omitted).  By comparison, when Commerce develops a model-match methodology in an investigation, it is afforded "considerable discretion" and need only support the methodology with substantial evidence and a reasoned explanation.  *Bohler Bleche*, 324 F. Supp. 3d at 1350–54.

Here, the original investigation is being challenged and there was no methodology from a previous segment for Commerce to alter.  In the investigation, Commerce was developing, not revising, its model-match methodology.  Accordingly, the agency was not required to address the higher "compelling reasons" standard to support including a code for zinc coating.  The agency's model-match methodology need only be supported by substantial evidence.  *See id.* at 1354 (stating that the "only question before [the] court is whether the [agency's] chosen methodology is reasonable, supported by substantial evidence on the record, and otherwise in accordance with the law") (emphasis omitted).

### 2. Commercial Significance of the Zinc Coating

Next, the court considers whether substantial evidence supports Commerce's determination that zinc coating is a commercially significant characteristic (i.e., a characteristic that merits distinguishing between identical and similar products). The court finds that substantial evidence supports Commerce's determination.

As discussed above, foreign like product includes both identical and similar merchandise and Commerce has considerable discretion to establish its model-match criteria to distinguish between them. *See SFK USA*, 537 F.3d at 1379. "Commerce has wide latitude in choosing what physical characteristics to consider," and generally will recognize physical differences that are significant in terms of cost and price differences. *New World Pasta Co. v. United States*, 28 CIT 290, 308, 316 F. Supp. 2d 1338, 1354 (2004).

Here, Commerce supported with substantial evidence its conclusion that zinc coating is a commercially significant characteristic.[7] Commerce cited sales documents indicating that zinc coating is optional and selected by Sahamitr's customers.[8] I&D

---

[7] While Plaintiffs fail to identify evidence that detracts from the agency's findings, their questioning of the evidence is somewhat understandable. Although Commerce cited record evidence in its analysis, certain of its citations are mis-directed and do not obviously support the associated findings. Nevertheless, examining the agency's reasoning and referenced record evidence as a whole, the court is able to reasonably discern the path of the agency's reasoning. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

[8] Plaintiffs argue that Commerce's conclusion that Sahamitr's customers request zinc coating is unsupported by substantial evidence because Commerce relied on Sahamitr's 2016 annual report, which does not describe a spraying process, and new information obtained at verification. *See* Pls.' Mem. at 23–24; Oral Arg. at 15:10–15:20 (time stamp from recording), *available at* https://www.cit.uscourts.gov/sites/cit/files/

Mem. at 23 & n.182 (citing, *inter alia*, SBCQR, Ex. SSQ-7 (customer's terms and

conditions requiring spray coating of zinc wire)).  Commerce found that zinc coating

requires a "special process" in that Sahamitr "'prepare[s] the base coat by spraying pure

zinc wire' with certain specified thickness'" and applies "other specified base coat or

'other brands.'"  *Id.* at 22 & n.171 (quoting SBCQR, Ex. SSQ-7).  Commerce also relied

on evidence in which Sahamitr identified the price and cost differentials between

CONNUMs differing only as to zinc coating.  *See id.* 23 & n.184 (citing SBCQR, Ex.

SSQ-7, pt. 2; SDQR, Ex. FSD-11).  Commerce also cited Sahamitr's 2016 annual report

to support its finding that zinc coating prevents rust and extends the useable life of a

cylinder.  *See id.* at 22 & n.174 (citing AQR, Ex. A-9 at 89).  The 2016 annual report

states that Sahamitr offers a hot-dipped galvanized cylinder that is "highly resistant" to

the effects of high humidity and, "therefore[,] it helps reduce the maintenance and cost

of [the] cylinder, and waste of the obsolete cylinder."  AQR, Ex. A-9 at 89.  Although not

explicitly stated in the Issues and Decision Memorandum, nothing suggests that

Commerce's finding that zinc protects against rust and extends the life of cylinder is

dependent on how the zinc coating is applied (i.e., spray or hot dip).[9]

_____

092420-19-00147-MAB.mp3 (last accessed Dec. 3, 2020).  However, Commerce also
identified the terms and conditions in a contract between Sahamitr and a customer
indicating that the customer required the zinc coating.  *See* I&D Mem. at 23 & n.182
(citation omitted).  Thus, substantial evidence supports this finding.

[9] Plaintiffs contend that the hot-dipped galvanized cylinders are not the same type of
cylinders sprayed with zinc coating, thereby challenging whether the protective
properties described in the 2016 annual report can be attributed to the subject
merchandise.  *See* Pls.' Mem. at 22; Oral Arg. at 13:25–15:07.  Plaintiffs, however,
agree that zinc protects against rust in humid climates, Oral Arg. at 5:10–5:15, and do

Plaintiffs argue that substantial evidence does not support Commerce's finding that zinc coating results in a pricing premium because Commerce accepted Sahamitr's reporting of home market and U.S. sales on a tare-weight basis but considered the cost and pricing effects of zinc coating on a per-cylinder basis. *See* Pls.' Mem. at 25–26. Commerce explained that although Sahamitr reported sales on a tare-weight basis, Sahamitr conducted sales in both the home and U.S. markets on a per-cylinder basis. I&D Mem. at 23; *see generally id.* at 25–26 (explaining that Sahamitr's home market and U.S. sales databases, which were reported on a tare-weight basis, were reliable). Commerce found it "more meaningful to measure the price differences based on . . .  a per-unit cylinder basis." *Id.* at 23.  Although Plaintiffs disagree with Commerce's conclusion, they have not identified any evidence indicating that price and cost comparisons on a per-cylinder basis are less reliable for evaluating the relevance of zinc coating than if they had been performed on a tare-weight basis.  Thus, Plaintiffs fail to provide a basis to call into doubt Commerce's analysis.

The Parties also dispute whether Plaintiffs exhausted their administrative remedies with respect to the argument that Commerce failed to address evidence that zinc coating is not commercially significant because non-zinc coatings also extend the life of a cylinder and prevent rust.  *See* Gov't's Resp. at 11–15; SMPC's Resp. at 6; Pls.'

---

not identify evidence that such protection changes depending on the method by which the cylinder is coated.  Thus, although the evidence cited by Commerce is less than ideal, the court "cannot find . . . so little evidence on the record as to be less than a mere scintilla or less than that which a reasonable mind might accept as adequate to support a conclusion."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1563 (Fed. Cir. 1984).

Reply at 7.  The court, however, need not resolve this issue.  Assuming that Plaintiffs

did exhaust their administrative remedies and that Commerce did not address evidence

identified by Plaintiffs, *see* Pls.' Mem. at 22–23, the agency's oversight would not

require a remand.  Commerce is not "required to explicitly address every piece of

evidence presented by the parties," but only "significant arguments and evidence which

seriously undermines its reasoning and conclusions."  *U.S. Steel Corp. v. United States*,

36 CIT 1172, 1174, 856 F. Supp. 2d 1318, 1321 (2012) (citations omitted).  Considering

the record as a whole, Commerce has supported with substantial evidence its decision

to accept as commercially significant the distinction between zinc and non-zinc coatings

because zinc coating requires unique production processes, is specifically requested by

customers, and leads to price variations. *Cf. Bohler Bleche*, 324 F. Supp. 3d at 1350

(finding that "differences in cost and price" attributable to a physical characteristic and

that "customers would view" such products as distinct, indicate that a physical

characteristic is commercially significant).  Any failure to compare protective qualities (or

the degree of protection) as between zinc coatings and non-zinc coatings would not

undermine that decision.  Thus, Plaintiffs' argument is not sufficient to warrant remand

under the substantial evidence standard.  *See U.S. Steel*, 36 CIT at 1181, 856 F. Supp.

2d at 1327 (noting that the reviewing court "under the substantial evidence standard

must defer to the [agency]" when "there is an adequate basis in support of the

[agency's] choice of evidentiary weight").

For the foregoing reasons, the court sustains Commerce's conclusion that zinc coating is a commercially significant characteristic.[10]

## II.  Cost of Production Data

### A.  Legal Framework

"In assessing the reliability of a respondent's cost of production," the agency must confirm, among other things, "that the costs are reasonably and accurately allocated to individual control numbers." *Hyundai Elec. & Energy Sys. Co. v. United States*, 44 CIT ___, ___, 466 F. Supp. 3d 1303, 1309 (2020) (emphasis omitted) (citation omitted).  Typically, Commerce will rely on a respondent's normal books and records to determine the cost of production, provided that they "reasonably reflect the costs associated with the production and sale of the merchandise."  *See* 19 U.S.C. § 1677b(f)(1)(A).

When necessary information (such as cost of production information) is not available on the record, or an interested party withholds information requested by Commerce, fails to provide requested information by the submission deadlines,

---

[10] Plaintiffs argue that Sahamitr failed to report the portion of the CONNUM related to the external coating of the cylinder consistent with Commerce's instructions in the Initial Model-Match Letter.  *See* Pls.' Mem. at 15–16.  However, at oral argument, Plaintiffs acknowledged that Sahamitr did in fact provide the information as requested by Commerce albeit with alternative CONNUM fields including a code for zinc coating.  Oral Arg. at 4:15–4:40.  Therefore, Plaintiffs' argument that Sahamitr failed to comply with Commerce's reporting instructions must fail.

Similarly, Plaintiffs' argument that Commerce's initial model-match criteria, which did not distinguish zinc from other coatings, implies that zinc coating is not commercially significant, *see* Pls.' Mem. at 15, fails because Commerce obtained information regarding the commercial significance of the zinc coating during the investigation (i.e., after the Initial Model-Match Letter), *see, e.g.*, I&D Mem. at 22–24.

significantly impedes a proceeding, or provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i), Commerce "shall . . . use the facts otherwise available." *Id.* § 1677e(a).

### B. Background

For the *Final Determination*, Commerce accepted Sahamitr's reported CONNUM-specific costs notwithstanding Plaintiffs' arguments that there were cost differences between certain pairs of CONNUMs that appeared to be out of proportion to the differences in physical characteristics based on the CONNUM description.  I&D Mem. at 39 & n.269 (citation omitted).  Because Commerce found that Sahamitr's cost of production data were reliable, the agency found it unnecessary to rely on facts otherwise available or use an adverse inference. *See id.* at 39–40.  Plaintiffs challenge these conclusions.  *See* Pls.' Mem. at 28–40.

In response to section D of the initial questionnaire, Sahamitr stated that it tracks "production costs on [a] product-specific basis" and reported "weighted-average costs for all products sharing identical CONNUM physical characteristics."  BCDQR at D-17 to D-18.  In response to the supplemental section D questionnaire, Sahamitr further explained that it used its "standard cost structure to capture accurately cost differences stemming from the different physical characteristics of the various cylinder types that SMPC produces."  SDQR at FSD-10.

Commerce preliminarily determined that Sahamitr's cost data were reliable subject to two exceptions that are not relevant here.  *See* Prelim. Mem. at 12.  At verification, Commerce confirmed that Sahamitr allocated "total actual costs for each

cost element [of a CONNUM] on a product-specific basis."  Verification of the Cost

Resp. of [Sahamitr] (Apr. 24, 2019) at 15, CR 278, PR 193, CJA (Vol. V) Tab 39.

In their administrative case brief, Petitioners argued that Sahamitr's cost of

production data were unreliable because they had identified several CONNUM pairings

that were nearly identical—with the exceptions of two characteristics—but had

unexplained cost differences.  Pet'rs' Case Br. at 18; *see also id.* at 15–16 (citing

several pairs of CONNUM that purportedly exhibited such cost differences).  Petitioners

argued to Commerce that Sahamitr's failure to provide reliable cost of production

information warranted the use of total AFA.  *Id.* at 19.

Commerce rejected Petitioners' arguments and continued to find Sahamitr's cost

of production information reliable.  *See* I&D Mem. at 36–40.  Commerce explained that

Sahamitr's reported costs "derived from the company's normal accounting records,"

which Commerce found were "maintained in accordance with the generally accepted

accounting principles (GAAP) of Thailand."  *Id.* at 37; *see also id.* at 38 (finding that

Sahamitr's books and records satisfied the requirements of 19 U.S.C. § 1677b(f)(1)(A)).

Commerce found that Sahamitr "classified each cylinder produced into the appropriate

CONNUM based on the physical characteristics defined by Commerce and used the

product-specific costs from its system to derive weighted average per-unit cost[s] for

each unique CONNUM."  *Id.* at 38–39 & n.265 (citation omitted).

Commerce acknowledged that the physical characteristics captured by each

CONNUM did not reflect all "processing activities" and "physical distinctions" in

Sahamitr's cylinders.  *Id.* at 39.  In particular, the size, weight, and design of collars and

foot rings assembled and welded to the cylinders sold in the home market differed from those used on cylinders sold in the U.S. market.  *See id.*  Commerce acknowledged that the "CONNUM structure [did] not reflect any differences associated with these physical distinctions."  *Id.* at 39 & n.270 (citation omitted).  Nevertheless, Commerce found that these cost variations were "relatively minor" and insufficient to conclude that Sahamitr did not submit its costs on a CONNUM-specific basis.  *Id.* at 39.  Commerce also rejected Petitioners' analysis of Sahamitr's cost data as including material costs that were inconsistent with differences associated with one physical characteristic unrelated to coating.  *Id.*  According to Commerce, Petitioners' analysis of this issue did not account for zinc coating and how "the product costs would differ depending on whether the cylinders are coated with zinc."  *Id.*

Accordingly, Commerce concluded that Sahamitr did not withhold cost data, the record did not lack "necessary information," and thus, reliance on total AFA was unnecessary.  *Id.* at 40.

### C.  Parties' Arguments

Plaintiffs argue that Sahamitr reported cost differences that cannot be attributed to the physical characteristics based on Plaintiffs' selected pairs of CONNUMs.  *See* Pls.' Mem. at 28.  Plaintiffs assert that the unexplained cost differences owe to Sahamitr withholding cost information and not accurately reporting costs on a CONNUM-specific basis.  *See id.* at 28–29.  Thus, Plaintiffs argue, substantial evidence does not support the agency's conclusion that Sahamitr's cost data were reliable.  *See id.* at 28; Pls.' Reply at 11.  Because, in Plaintiffs' view, Sahamitr's cost data are unreliable, substantial

evidence does not support Commerce's refusal to rely on total AFA.  *See* Pls.' Mem. at

40.

The Government argues that the cost differences in the pairs of CONNUMs

selected by Plaintiffs are explained by differences in costs for the collars and foot rings

on the cylinders differing as between the home and U.S. markets.  Gov't Resp. at 23.

To that end, the Government contends that most cost variations between CONNUM

pairings align with cost variations for different dimensions of collars and foot rings as

recognized and explained by Commerce.  *Id.* at 22; *see also* SMPC's Resp. at 10–11.

The Government acknowledges that one CONNUM comparison identified by Plaintiffs

shows more than minor cost differences but contends that this example is an outlier and

not representative of the other cost differences.  Gov't Resp. at 20.  Finally, the

Government argues that total facts available—neutral or adverse—was not appropriate

in this case because Commerce reasonably determined that necessary information was

not missing from the record.  *Id.* at 24; *see also* SMPC's Resp. at 11–14.

### D.  Substantial Evidence Supports Commerce's Conclusion that Sahamitr's Cost of Production Information is Reliable

Commerce acknowledged the cost variances between CONNUM pairs identified

by Petitioners and provided a reasoned explanation why the variances did not detract

from the reliability of Sahamitr's cost of production data: they were minor and explained

by differences in the collars and foot rings that were not accounted for in the physical

characteristics used to assign CONNUMs.  *See* I&D Mem. at 39 & n.269 (citing

Narrative Resp. of [Sahamitr] to the Third Suppl. Questionnaire (Feb. 20, 2019), Exs.

TSQ-8 & TSQ-9, CR 214–25, PR 175, CJA (Vol. III) Tab 35).  The CONNUM pairs

selected by Plaintiffs reflect cost differences across non-identical CONNUMs which

Commerce reasonably associated with the processing activities for distinct cylinders

sold in the Thai home market and the U.S. market (i.e., the collars and foot rings).  *See*

I&D Mem. at 39.  In other words, this was not a case in which the respondent failed to

average cost differences within a CONNUM and Commerce rejected the suggestion

that it average those differences across different CONNUMs.  Plaintiffs have not

presented any evidence undermining this conclusion.

Again, Commerce considered and rejected Plaintiffs' argument based on other

comparisons of CONNUM pairings with one physical difference.  *See id.* at 39 & n.271

(citing Pet'rs' Case Br. at 15); Pls.' Mem. at 30.  Commerce explained that Plaintiffs'

argument in this regard was not credible because it was based on an analysis that did

not account for cost differences attributable to zinc coating—a commercially significant

feature.  *See* I&D Mem. at 39.  Plaintiffs' arguments on appeal are little more than an

invitation for the court to reweigh the evidence considered and rejected by Commerce, a

task that the court will not do.  *See Downhole Pipe & Equip., L.P. v. United States*, 776

F.3d 1369, 1376–77 (Fed. Cir. 2015) (explaining that the court does not reweigh the

evidence).[11]

---

[11] Plaintiffs contend that Commerce's determination is not supported by substantial
evidence because the agency did not consider the cost difference evident in a particular
CONNUM pair.  *See* Pls.' Mem. at 32–33.  As explained above, Commerce supported
its determination that the cost data were reliable with substantial evidence.  Thus, the
absence of a discussion regarding this one specific CONNUM pair that the Government
now describes as an outlier does not prevent the agency's decision from being
supported by substantial evidence.  *See Timken U.S. Corp. v. United States*, 421 F.3d

Court No. 19-00147                                                                                           Page 21

Finally, Plaintiffs contend that Sahamitr's purported failure to report cost data

reliably warrants use of total AFA.  *See* Pls.' Mem. at 40.  Because substantial evidence

supports the agency's conclusion that Sahamitr reliably reported cost data, substantial

evidence also supports Commerce's determination not to rely on total AFA.  *See* I&D

Mem. at 39–40.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Determination* is sustained.  Judgment will

enter accordingly.

                                                            /s/      Mark A. Barnett
                                                            Mark A. Barnett, Judge

Dated: December 3, 2020
        New York, New York

_____

1350, 1354 (Fed. Cir. 2005) (citation omitted) (explaining that the agency is only
required to address "issues material to the agency's determination").